the court will call the next case. Mr. Lester, you may approach and proceed. Thank you, Your Honor. I please the court, Your Honors. This is an appeal from Rock Island County. I represent the defendant, Appellant John Huber. John Huber was an accountant with the Planoff Accounting Firm and the Carpentier Firm. The trial judge entered a judgment for almost $100,000 against Mr. Huber, who departed that accounting firm and took and removed his practice to another firm. This judgment was entered despite the fact, and it was based on a provision in an agreement which he enforced in part, an agreement that John Huber never signed, and had he signed it, it didn't apply to him anyway, because the agreement only applied to what were defined as members of the accounting firm, and a member was a person who had an ownership interest. And as such, it's my opinion that this judgment was entered without authority of any law. I'm unaware of any case in the United States, let alone the state of Illinois, that holds that an employee, a coworker, whatever you want to call them, who departs, and then represents or has customers or clients that were formerly with the business that he was in, and absence any claim of a breach of fiduciary duty, and there was no such claim in this case, that there's any case law that supports simply imposing some obligation to pay the firm from which you have departed. There's no case that says that, and no case has been cited by the opposition. And when you read the complaint of the opposition, at least when I first wrote it, and I think any reasonable lawyer would take it the same way, I'd like to think I'm a reasonable lawyer, that it appears to be a claim based on a breach of contract or more precisely, an effort to enforce this provision of the contract that has a monetary penalty when you depart. Now in the brief which has been filed here on appeal, opposing counsel claims that that's not his theory, his theory is inequity, he claims. He claims that he's in quasi-contract, not on the basis of an express written agreement. Well, I mean, we've in our reply brief, we set out very precisely the bullet points next to him, all of the allegations, which makes it look like an express agreement. And then he cites cases about ratification of contracts. Well, we looked at every one of those cases, and we discussed them in the reply brief. And every one of those cases, say that the whole ratification doctrine, which he relies on is the same as an express written contract theory. In other words, we can quote from one case, which says, when you ratify a contract, it's the same as if you had signed it. So he's on an express written contract theory, at least that's the way it appears. The problem with the express written contract theory is, as I indicated, he didn't sign the agreement. And more importantly, he was not a member. Because to be a member, you have to have an ownership interest in the firm. He never had that. I mean, their claim is that he somehow became a member because he accepted benefits. Right. Like members, I guess he was compensation. Well, there are several allegations, and we've attempted to deal with them in actually both briefs. But one of them is that he was held out to the public as a member. He had to sign off. He had to sign off on letters as a member. They printed up cards that said he was a member. There was actually a provision, I think, later on, where he was paid one half, of the firm profits on clients that he generated. So that gave him some increased compensation, and maybe they increased his salary. And he claimed these were benefits of membership. But when you go to the definition of member, it's very precise, it's very clear. And this court, of course, in construing a contract, is entitled to decide it on a de novo basis, because that's what the cases say. And in section 1.24 says, member means any person who holds an interest in the company represented by units. Well, they never issued the units, but you still have to be an owner. And you can see that he was not an owner, attached to the very complaint is his interest in the company. And it says 00.00, and it shows that he never signed it. And I said a member means a person who holds an interest. Interest is defined in section 1.21. It means the personal property ownership right in the company. So it doesn't do any good to talk about these other matters, such as being held out as a member, or getting supposedly other so-called benefits. He didn't get the one benefit, which is the sine qua non of membership. And that's ownership in the firm. And of course, when you're an owner, then you share in the overall firm profits. He didn't share in the overall firm profits. When you look at the withdrawal agreement, it talks about these members having capital. And then what the formula says is that when you leave, and you represent former clients, and you have to pay this penalty, then you set off that penalty against your capital account, and then you get back what's left in the capital account. Well, of course, it was undisputed that there was no capital account. Huber had no capital account. The trial judge found, he said, when you look at those tax returns, I see all zeros. Zero for capital, or equity in the firm. Zero for share of the profits. Zero for share of the losses. So he says all zeros. Those were his fact findings. Based on those fact findings, and of course he couldn't make any other fact findings, because it's apparent on the whole face of the complaint. On the basis of those fact findings, and this court reading the definition, or the trial judge should have read the definition, you've got to come to the conclusion, he was not a member, therefore he was not subject to this agreement. Now, the interesting thing is, when you read the opposition's brief, he says, well, we can't literally apply the agreement. We aren't trying to do that. We're in a quasi-contract. But they're applying the agreement as far as damages, though. Well, that's what doesn't make any sense. If you can't apply, if they're not relying on the agreement, how do we get to the part which he's enforcing? There is no viable theory that supports this entire claim. And when you get to quasi-contract, and incidentally, it was my belief, that as I read the opposition brief, that Consell was mingling these various theories, quasi-contract, ratification, and contracts implied in fact, and contracts implied in law. And these have very distinct kinds of elements. And I think what Consell did was to kind of mix them all together and shape. And so what I attempted to do in our reply brief is to lay out specifically what these three different contract theories are. And the claim is that they're on a basis of a contract implied in law, which is quasi-contract. And quasi-contract basically is an unjust enrichment theory. And the Supreme Court has said, quasi-contract or a contract implied in law is quote, this is a Supreme Court talking, no contract at all. So why we're talking about any provision of the contract, if that's the theory, really doesn't make any sense. But when you get to the unjust enrichment theory, Huber wasn't unjustly enriched. There's no claim that he didn't earn every penny he was paid. That he didn't do a day's work for a day's pay. So there's no basis for that. If the claim of unjust enrichment is based that he now does some work for former clients, clients are not the property of the former firm. We cite the cases which say that no company, no business entity has a proprietary interest in clients. That they are not the property of a particular firm. So there's no basis for this unjust enrichment theory. Actually, counsel doesn't call it unjust enrichment. He calls it quantum error. And once again, no case in the United States, no case in the state of Illinois has been cited. And we've never found any which have ever had that a former worker in a company, whether it be an accounting firm, whether it be anything, who hasn't signed an agreement where the terms of the agreement don't apply to him, that you can use an unjust enrichment theory or some kind of implied in law theory to enter a judgment against him. It's just not the law. There's all kinds of cases where courts, this court has done it, other courts have done it where they've enforced covenants not to compete. And this particular provision is in the nature of a substitute for a covenant not to compete. But they don't have it because counsel admits it doesn't literally apply to him and he didn't sign it. So where are we with this case? It's a case in which I think where judgment was entered without any authority of law, no case law. And counsel actually on the cross appeal is asking for more money than that. Basically, he's asking for three times as much money. And of course, as we said in one of the points in our brief, they actually wanna get back from him his last three and a half years of salary. And that's called equity. That's gotta get new meaning to the word equity. So basically in my judgment, this is a case where there was simply no basis for legal relief. And I haven't seen any case which is upheld. This is a basis for legal relief. The trial judge didn't cite any cases in support of his opinion. And incidentally, one other matter, if I still got the time, everybody in the courtroom seemed to understand there's something that happened during the course of that trial because the trial judge got into it with counsel. And he said, what if somebody doesn't have, just a regular employee doesn't have an agreement and he decides to walk out. And the accountant who's on the stand for the plaintiff, he's one of the plaintiff's accountants, says there's nothing we can do about that. We don't have a covenant not to compete. They can just walk out the door and take their clients with them. And in fact, Mr. Noe, when he came back to question this witness, he said, well, if that's the case, you just leave. And that's the way it goes. And the accountant on the stand said, yep, that's the way it goes. Well, that's the way it goes in this case because there was no agreement. And even the judge said, if they don't reach member status, then that's the way it goes. Well, Mr. Huber never reached member status. So that's all there is to the case. There was no case. The complaint didn't state a cause of action and they didn't prove a cause of action because basically all the trial did was prove what he alleged in the complaint. So there was no basis for relief. Any other questions? If not, thank you, Mr. Leste. Thank you, Your Honor. Mr. Noe. Thank you. You're welcome. Good afternoon. May it please the Court. I'm here representing the Molina County firm of carpenter Mitchell Goddard Company, LLC. And with me are Terry Goddard and Jim Taylor, two of the managing members. In this proceeding, Your Honor, my client seeks fair recovery for losses suffered by the firm due to John Huber's conduct. We sought those damages on an equitable basis which the Illinois Courts have already found... Now, the conduct you're referring to is what? Pardon me? The conduct you're referring to is what? Conduct is leaving our firm and taking 50 to 60 of our clients with them to a competing quadcity of companies. And there was not... There weren't any covenants not to compete, are there? Not a covenant not to compete. There was instead a, as Mr. Leste said, sort of a substitute for that being the provision in the operating agreement requiring a monetary payment. Now, he never signed the operating agreement. He did not sign the operating agreement, but I have cases that I'd like to address that would hold people to an obligation because they accepted the benefits even though they didn't sign the agreement. What kind of legal principle is that? Is that like an estoppel principle? They called it a five-contract, a three-contract, a front-of-merit estoppel. In cases that I'd particularly like to highlight here for you, I think they've used estoppel. But what you do, so you can maybe cover this at the same time or interrupt to produce a second answer along that line, is this case a little bit different because not only did he not sign it, it's not a matter of just omission, not signing it. It seems to me that he made it very clear that he wasn't going to sign it until he became a member. In other words, not just didn't sign it, didn't happen, sitting on the corner of my desk, but he wrote letters and said, I'm not signing this until I'm a member. He said, until I have a vote. And the only reason he expressed for not signing it, he never objected to the provision that would require payment upon leaving. And, of course, leaving, you have to leave under certain circumstances. You can leave. It's a free country. But if you leave and you stay in the area in public accounting and you take the firm's clients, that's when you have to pay. That's pursuant to the operating agreement. To the operating agreement, right. And he never objected to that, Your Honor. But he did say that until I can vote, I don't want to sign it until I can vote. Well, of course, that would make it a managing member. And I'll get to that. Well, let me ask you, what contract are you enforcing now? Are you enforcing the operating agreement? We're enforcing... Our theory in this case was proceeded on equitable relief called by the court's implied contract or estoppel. But basically, that's into the contract. And we feel that there's a basis to recover either way. In other words, we think that John Euber's contract holds him to this responsibility, whether you call it and you reach that fair result by invoking the doctrines of the implied contract, estoppel, and so on, or enforcing the contract because ratification and estoppel, and I, of course, talk about ratification, and they hold these people to the contract terms that they have. And that's what I would like to address. He mounts a technical defense here based on reading certain provisions that Mr. Lestang just talks about, the definition of this and the definition of that. But when you really read this document as a whole, which is what the court has to do, I think it's very interesting that regardless of whether we're going on equity or we're going on the contract, our client is entitled to prevail. Under Illinois law, a party to a business transaction cannot take the benefits of the relationship without becoming liable to honor the obligations. Again, that's sometimes called implied contract, quasi-contract, quantum error, estoppel, ratification. But the cases, and, of course, I don't have time to discuss all the things that are brief, but just to highlight three cases that I think are very illustrative for the court. The Wasserman case was a case where three men went into an auto sales business to be paid loans. Mr. Wasserman paid $20,000, worked for Lestang, believing that he was a shareholder. He never signed the agreement because they had a disagreement about how much he would get paid when he redeemed his stock. They then parted companies. These three investors had a difference of opinion, and the other two said, Wasserman, you're not a shareholder. You never signed the agreement. You don't get nothing. And the court said, no. The others received the benefit of the agreement, and they're thus stopped from claiming Wasserman was not a shareholder because he didn't sign it. And the court went on to say that a person who prevents the performance of an alleged condition to a contract cannot take advantage of his conduct to claim that the resulting failure of the condition relieves him of his obligations. It's interesting that Mr. Wasserman was with these people for five years, just about the same length of time that John Hoover practiced with our firm as an LLC. The next case is a third district case by this court some years ago, an SRI court case, and it was a partnership to develop a hotel in downtown Rock Island. An investor named Jed Mills bought out an original partner and never signed the partnership agreement. He then argued later he wasn't bound by his terms. He said, I never signed it. And the court said, after you acquired your interest, you assented to the conditions of the partnership by your conduct. And so as between the parties, the court said, the question of existence of a partnership agreement is one of attention to gather from all the facts and circumstances. And finally, the Rock case that we cite, what did the appellant do here that he benefited from? What was his conduct that assented to the terms of the contract? He used business cards that called himself a member. He signed a correspondence going out the door as a member. What benefit did he receive from that? Okay, well, he was enabled himself to hold himself out to the public and attract business by virtue of his status as a member or principal of his firm. He also signed audit papers. Well, first of all, before that, he could accept or reject business. And when somebody walked in the door and said, I'd like to hire you to do my accounting work, he had the authority once he was a member in the country as a member to say yes or no. He could take that business or he could reject that business. He could set the fees. And he was shared in those fees, as Mr. Loebstein said. So those were all benefits to him. He then got increased compensation. Well, before that, he signed up on audit work papers. He signed tax returns. And then he got increased compensation. And now he would get increased compensation, but it was reported to the IRS in a different way. In other words, it wasn't a W-2 as an employee would get where there's withholding. It was a K-1 and a gross amount was reported to the government. So he got increased compensation. And as an accountant, of course, he would be very familiar with what all this means and the difference between taking gross pay or taking net pay. William? I've never been an accountant, but I've worked in big law firms. And you know the shell game. You take a senior associate or somebody, you call them a partner, and he has no ownership interest. And therefore, you get a partnership also gets to, the corporation gets to increase the fees, the discount charges. So they benefit probably more than the kid who now gets to stay on a partner in this pyramid scheme. And, and, and... But he still has no ownership interest. And the fact that he gets more money, you know, he's working harder, he's been there longer, he has more value. But the corporation itself also benefits from a result of this guy holding himself out as a partner because they get to charge more money for his hourly work. Is there any, is there any analogy to be drawn between the way we know law firms do it as opposed to the way accounting firms do it? Well, not in this case, because with all due respect, the evidence was undisputed at the trial that once Mr. Huber became a member, he had the sole authority to not only accept the rejected business, but also to set the pace. So he set the pace. Some senior partner didn't say, your rate is now $175 an hour or something else like maybe a law firm might do, as you allude. That wasn't the kind of case. Well, what's the date he became a member? He became a member when the LLC was formed, which was effective December 4, 2001, and they actually implemented it January 1, 2002. And that's when he refused to sign the operating agreement? He was tendered the operating agreement and did not sign it because he said I object to not having the book. If I could just briefly... Is this a nature of a bilateral contract or unilateral under your theory? I think it's a... I think it becomes a bilateral contract, and I'll explain that in just a second. What were his rights under the bilateral contract? His rights were to have increased compensation because he was a member. And once he became a member, he then got more pay and a different type of pay than he would get if he was an employee. What was the standard that he could use if he sued the partnership saying, you didn't pay me enough? They set his... The compensation was always set year to year. Who set the compensation? The managing partner set the compensation, but they did it with a balance of a guaranteed portion of the payment and a percentage portion of the payment. The percentage portion of the profits being what he was bringing in, the portion of what he was bringing in. So he could sue over that under your theory? Yes, sure. If he didn't pay that, he certainly could. Under your theory, are other employees, members too, even though they don't sign the operating agreement? Well, yes, it could be, and I'll tell you why. And that is that if we... I was going to discuss the Grott case, but let me jump to... I think you can read it. That was just another case where the court said the party that accepts the benefits of the agreement to stop and denies its existence. But let me get to something I think is more germane to what the court's asking. If we look at the terms of this agreement, it says... Their defense is to be a member, you have to make a capital contribution. Huber didn't make a capital contribution, therefore he's not a member, and therefore Section 10.4 doesn't apply to him. The reason that argument fails is this, that if you look at the... As we've fled throughout this entire case, the agreement identifies him as a member. And it says in the contract, and it's in the operating agreement, that you look at Schedule 1 to see who the members are. And if you look at Schedule 1, which is Appendix 17, you have a list of the members, and John Huber is listed as a member. If you look at Section 4.1 of the operating agreement, and it says it's in 8.12, perhaps it claims 12, initial members shall be as set forth in Schedule 1. And it goes on to say in 4.1 that such common members shall contribute to the capital of the company the respective amount set forth in Schedule 1. Then you look at John Huber's line, it's John Huber, 0. In other words, Huber was permitted to be a member without making a capital contribution. And now he wants to turn the largesse of the firm against the firm by saying, because you didn't make me pay anything, you let me be a member without paying, I'm not going to be a member when I walk out the door. He was happy to be a member when he was there for those five years, taking increased compensation, getting his country club dues paid, et cetera, et cetera. But when he leaves, he suddenly doesn't want to be a member. But isn't there a real difference? I mean, you're sort of glossing over the fact that he obviously wasn't real happy when he specifically rejected what had been handed to him, because it didn't have the type of membership, it didn't have the agreement and the benefits that he was bargaining for. I mean, it isn't one of these cases where you sign it and you go in sort of thinking this is what you're going to get, and then fighting about it later, or, I mean, this is, you know, before, there's never any agreement between these people. There's never, there's never a full agreement. He says what he wants and they say no. Well, if that was the case, he could have left back in 2002. But what did he do? He stayed there in 2002, three, four, five, and up until August of 06 and took the fruit. He took all the, picked all the fruit off the tree, took increased compensation. But there's a piece of that fruit that he doesn't reach on that tree, that he wanted, that he kept saying I want. And the reason he didn't have a vote was because he had not made a capital contribution. That was the difference between managing members of members. The four people that are managing members, these two gentlemen that are here today, plus Brad Mitchell and Dave Merrill, contributed capital. So they were the managing members and under the LLC Act and in this agreement it talks about managing members running the firm and so on. They put the money up. Mr. Huber and Mr. Positari, the other members, did not put any money up but they were allowed to have member status without making a capital contribution but they didn't get the vote. If he wanted to get a vote, he could have made a capital contribution. He didn't do that and he didn't leave. He just stayed there and accepted the status until he was ready to walk out the door and decided he didn't want to be a member anymore. Well, are you saying that it was incumbent if he didn't like the contract that they set in front of him that it was incumbent upon him then to quit as opposed to them to fire him if he, you know, in the non-compete cases you'll see it's hard to fire if you're not signing them or quit rather than sign them whatever the case might be. He certainly had the compromise of quitting if he didn't think that it was a fair thing if he wasn't getting enough benefit out of this arrangement. He had every right as a free person to walk out the door but he didn't choose to do that until August of 2006. Now, the firm has accepted benefits of the work he did too, didn't they? The firm got the benefits and it was a mutual benefit. I'd like to, in the brief time I have left, point out that the court we have a difference of opinion in this case about the standard review. The court in this case made these factual findings. They said in their brief, if I go to page 7 it wasn't clear that he ever found that Mr. Huber was a member but on page 7 of his opinion the judge said in appendix 33 quote, you were made a member, Mr. Huber, unquote. Also, the judge found that an implied contract existed between the parties and referred it to that twice, both on page 3 and page 5 of his opinion. And they agree on page 19 of their brief that he did engage in fact-finding and yet those fact-findings are entitled to be upheld unless they are contrary to the manifest way to the evidence. And in this case, as I said, all the things that we've alluded to were evidence that supported the fact that Mr. Huber was a member and acted as if he came and accepted the status of member until he decided he didn't want to be a member when it came time to make the payment. This is not parole evidence, as they say, it's all things that happen after the agreement  considered by this court to decide how the parties interpreted the agreement and his acceptance. Go ahead and finish your thought. Okay, just real quickly. Mr. Huber was a member and he admitted several times in his testimony that he was a principal and that, not only, all of this, not only makes the non-signer liable and equitable principles, but solidifies his contractual status as a member because the court many times said by your conduct you have ratified this agreement. Signing is an addition of agreement, but also conduct by all these cases can also indicate acceptance of the contract. I will reserve the rest of my comments on damages for my second record. Thank you very much. Los Angeles has more questions. I, I, I think we need to Five minutes after this. Okay, I just want to make sure how much time you have left then. Thank you very much.   Thank you, Governor. There's one thing I want to emphasize and the question has been asked many times and it's that the the the the the question   the    is is that important? And the the the context we would be of nature is the enough to have a can treat as a member someone who doesn't sign if he has an ownership interest in the company. This man never acquired an ownership interest in the company. He never accepted the one and only benefit that which Mr. Noe claims is ratification. He never accepted, he was never offered the opportunity to become a member. And the fact that his name was put on a list which says that he has a zero interest doesn't make him a member. That document says at the top of the list it says capital contribution of common members. And then you go to the analysis of who is a common member. And Mr. Noe's notion that he was a member is just simply incorrect. And  this whole case doesn't fly. And you also have here parole evidence rule which is not just the definition of a member. It's not just a rule for the trial court. The Supreme Court has said the parole evidence rule is a rule of contract construction where you look at the four corners. What Mr. Noe has attempted to do is to in effect rewrite this definition which is in the contract which should be decided on a de novo basis. Of course, but you're saying there is no contract. Well, I'm saying that he didn't sign it. It was potentially out there had he acquired an ownership interest. But he never did. So you can look at it both ways. He didn't sign it. He didn't       that    construction is a rule of contract construction where you look at the four corners. He didn't sign it. He didn't sign it. So   at it both ways. So there is no basis for any of this. And there's one other issue that I would like to touch upon. Mr. Noe said he just objected to signing the agreement because he couldn't sign it.  objected to signing both. Now that's just simply not correct. He sent an e-mail where he was very specific and he didn't just pay it to the right to vote. He says I will not sign the position that I hold is not a business partner. I make no decisions and I do not share in the profits like you three. And the profits are the overall profits of the firm. And it's only owners who share in those overall profits. He never shared in those. The only profits he ever got were one half of the profits made by the firm. He was never an owner because he was not an owner. He was never a member. And he didn't ratify the agreement because all of these acceptance of benefits cases which Mr. Noe talks about are basically express contract cases. I think a little case here, because the time isn't divvied up here, is Mr. Lipsman going to have an opportunity to, okay, so I've got a, I want to ask you a, and I know you don't agree that there should be any damages. Got that. Now, but I want to ask you a question. I want to ask you a question about the cross appeal, okay? Understanding, oh well, if you don't agree there should be any damages, I certainly understand your position, but assuming damages, just assuming for the sake of argument, would you agree that this measure of damages of punishing your client by, you know, finding for the value of his clients that he already owned as opposed to the firm's clients, just doesn't make any sense at all? Can you make any sense out of that? Frankly, your honor, I can't make any sense out of that. I can't make any sense out of the claim for $365,000. None of this applies under this agreement because he was not a member. The members have capital. They have equity. And that's what didn't make any sense. But I agree with you that none of it makes any sense. There simply was no viable legal therapy. And Mr. Newey still not cited the case in the United States and Illinois, which has ever, ever approved awarding damages under circumstances like this. And that agreement wasn't signed because he wasn't undertaking the obligations of a member because he didn't get the share of the profits, of the overall profits of the firm. Thank you, Mr. Newey. Thank you. Unfortunately, I'm limited in this five minutes, as I understand the rules, to just to cross the field so I can only talk about the damages. I'll have to rely on my briefs in the court to tackle that. On the amount, and to get to Justice Schmidt's question, the amount that was awarded, the $99,900, was fairly inadequate. It's less than $2,000 per client taken from us. When we talk about his clients, these were clients of the firm. It's like a law firm. The court knows your grand client and it's the client of the firm. If you look at Exhibit 28, which was part of our trial exhibits in the supplemental appendix at 18, the fees generated from the clients that John Uber took from us in one year were $325,000. He's had those clients since he walked out the door in August of 2006, presumably has been billing them since 2006 and will presumably do that for years to come. They claim this is an unconscionable amount and they've tried, as Mr. Lipstein alluded to in his first argument, to go backwards and say, well, look at how that compares to what he got paid. That has nothing to do with how much he got paid. This is a measure of future damages which was carefully measured out and it's very close to the practice in accounting field that if you sell an accounting practice, you customarily pay for one year on the basis of one year's billings. And the bill will be sustained. This is a reasonable measure of protection. The court can use the 364,848 as a measure, as a guideline, or if you're going to enforce the contract because you believe that you've gratified it by its conduct, you feel it's ambiguous in taking the conduct of the parties to see what they really intended and that is that it was a true relationship, firm member of the relationship, then you would award the 364,848. But we have offered options in our reply to both our briefs. One would be the amount that was agreed to minus the one account that he said he didn't take, $5,000 difference, the 324th which is the account based on one year's billings I just said, or if you did not award us anything for these clients as Justice Smith said that he brought in, that would be $264,962 or of course this court always has the option to remand this to the trial judge to let him further decide this measure of damages. All we're seeking is a fair recovery for a very substantial loss that we sustained by a person that came in, we handed him a bunch of clients when Brad Mitchell retired, and he walked out the door and made the conscious decision I'm going to leave, I'm going to stay in the Quad Cities and compete with you, I'm going to take 50 or 60 of your clients with me as I leave. I think that all we're asking for is equity and a fair recovery. Unless this court has further questions. Thank you for your attention. Thank you very much. Thank you both for your arguments here today. This matter will be taken under advisement and a written decisional issue.